OPINION
{¶ 1} Defendant-appellant, James B. Carpenter, appeals a decision of the Noble County Common Pleas Court, Domestic Relations Division, in this divorce action finding that plaintiff-appellee, Mary E. Carpenter, did not commit financial misconduct and that she is entitled to $23,461.00 from appellant's pension fund as part her distributive award of the parties' marital assets.
 {¶ 2} Appellant and appellee were married on May 19, 1984. It was customary for appellant to give appellee money every pay period from his paycheck with which to buy groceries and pay the parties' bills, including the mortgage payment and utility payments. Approximately a year to a year and a half before the couple separated, appellee had the couple's joint checking account changed into her name only.
 {¶ 3} After over nineteen years of marriage, the parties separated on October 5, 2003. About a month before the separation, the parties' adult daughter, Jamie Carpenter, moved home to help appellee pack for her impending move from the home. Appellee told her daughter they had "nothing to worry about, that all the bills would be taken care of and they'd be fine." (Tr. 7.)
 {¶ 4} Appellee removed money from the parties' account in the days surrounding her departure from the marital residence.
 {¶ 5} Shortly after appellee left the marital home, the electricity was shut off as a result of a past due balance. The water bill and gas bill had also not been paid in several months. The mortgage on the house was also severely delinquent, leaving the house in foreclosure. Appellant made arrangements to add $9,880.67 onto the end of his mortgage.
 {¶ 6} Two lawsuits were also filed against appellant by collections agencies after appellee left the marital home.
 {¶ 7} On June 2, 2004, appellee filed a complaint for divorce. On June 25, 2004, appellant's answer was filed. After a series of continuances, on October 27, 2005, appellant filed a counterclaim for divorce.
 {¶ 8} "The matter proceeded to trial on December 12, 2005. Appellee failed *Page 2 
to appear, but was represented by counsel. Appellee's counsel filed a motion for another continuance. The trial court dismissed appellee's complaint without prejudice, effectively denying the motion for a continuance. The trial court proceeded with appellant's counterclaim and heard testimony from appellant and the parties' adult daughter, Jamie Carpenter, only. On February 17, 2006, the trial court found that appellee did not commit financial misconduct and that she is entitled to $23,461 from appellant's pension fund. A decree of divorce was filed on March 2, 2006. This appeal followed.
 {¶ 9} Appellant's sole assignment of error states:
 {¶ 10} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY FAILING TO DETERMINE THAT FINANCIAL MISCONDUCT OCCURRED IN THIS MATTER."
 {¶ 11} Appellant argues that the trial court erred in finding that appellee had not committed financial misconduct. Appellant argues that because appellee did engage in financial misconduct, she should not have been entitled to a share of his pension. Specifically, appellant points to the approximately $800 he gave her each pay period to take care of the couple's bills. For many months prior to their separation, appellant contends that appellee did not pay those bills and, instead, appropriated the money for her own use. As proof of appellee's alleged misrepresentation, appellant highlights the testimony of his adult daughter where she indicated that appellee had told her that all the bills "would be taken of" and that they were "fine." (Tr. 7.)
 {¶ 12} Appellee contends that the trial court correctly held that she did not commit financial misconduct because appellant failed to prove that she profited from her actions or that it interfered with appellant's property rights. Appellee highlights appellant's testimony that the couple often "robbed Peter to pay Paul." (Tr. 35.) Appellee also emphasizes the fact that, as part of the matters that had been resolved between the two by agreement, appellee quit claimed her half-interest in the marital home to appellant. *Page 3 
 {¶ 13} In Callender v. Callender, 7th Dist. No. 03-CA-790,2004-Ohio-1382, at ¶ 19-20, this Court noted:
 {¶ 14} "An appellate court will not disturb a trial court's finding of financial misconduct absent an abuse of discretion. Rice v. Rice (Nov. 8, 2001), 8th Dist. No. 78682, citing Berish v. Berish (1982),69 Ohio St.2d 318, 319, 432 N.E.2d 183.
 {¶ 15} A spouse may not dissipate assets of the marriage. `If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property.' R.C. 3105.171(E)(3). The burden of proving financial misconduct for purposes of R.C.3105.171(E)(3) is on the complaining spouse. Jacobs v. Jacobs, 4th Dist. No. 02CA2846, 2003-Ohio-3466, at ¶ 25. `Financial misconduct implies some type of wrongdoing in that the offending spouse will either profit from the misconduct or intentionally defeat the other spouse's distribution of marital assets.' Wideman v. Wideman, 6th Dist. No. WD-02-030, 2003-Ohio-1858, at ¶ 34. Often times, courts will look to the timeframe during which the alleged misconduct occurred because the use of marital funds or assets during the pendency of or immediately before filing for divorce may demonstrate wrongful scienter. Detlef v.Detlef (Dec. 14, 2001), 6th Dist. No. L-00-1137. See, also, Babka v.Babka (1992), 83 Ohio App.3d 428, 615 N.E.2d 247; Gray v. Gray (Dec. 8, 1994), 8th Dist. No. 66565."
 {¶ 16} At trial, appellant testified that it was customary for appellee to pay the couple's bills, including paying the mortgage and the utility bills, such as the gas, electric, cable, and phone bills. (Tr. 20, 29.) Appellant was paid on Thursdays and he would cash his check on his lunch break. (Tr. 19.) Since appellant worked until 4:00 p.m. and appellee until 2:30 p.m., appellee would go to appellant's place of employment on payday after she was finished with work and appellant would give her approximately $800. (Tr. 19.) Appellee would then go grocery shopping and pay the bills while nearby. (Tr. 19.) In addition, because appellee got home from work before appellant, she was always the first to see the mail. (Tr. 21.) *Page 4 
 {¶ 17} Also, the couple originally had a joint checking account. (Tr. 20.) However, approximately one and half to two years before they separated, that account was changed. He testified, "* * * Then she had stated that her place of employment was going to start doing direct depositing and made the statement that she had to have a checking account in her name only for the direct deposit. So at that time a new account was started." (Tr. 20.) Appellant testified that he never wrote a check out of the new account, nor did he ever balance the checkbook. (Tr. 20-21.)
 {¶ 18} About a month prior to the parties' separation, their adult daughter, Jamie Carpenter (Jamie), returned home to help appellee pack her things. During that month appellee and Jamie had conversations about the bills. Jamie testified about those conversations as follows:
 {¶ 19} "A Basically they were just conversations regarding whether or not my dad, especially my brother since he's younger than me if they were going to be okay if everything was taken care of because I knew she was always the one who was basically the one that who paid all the bills. Dad gave her his pay check and she had hers and she took care of everything.
 {¶ 20} "* * *
 {¶ 21} "Q Okay, so you had conversations with your mom about, are things going to be okay?
 {¶ 22} "A Yeah.
 {¶ 23} "Q And what was her response?
 {¶ 24} "A She said that dad and Brian would have nothing to worry about that all the bills would be taken care of and they'd be fine." (Tr. 7.)
 {¶ 25} Appellee had also reassured appellant himself that the bills had been paid. (Tr. 37.)
 {¶ 26} Approximately two weeks later, on October 5, 2003, the parties officially separated and appellee left the marital residence. (Tr. 7, 20.) Shortly after appellee left the marital residence, electric service was shut off because of a past due balance *Page 5 
of $391.94. (Tr. 23, Defendant's Exhibit B.) It also became apparent that other utility bills likewise had not been paid for the preceding two to three months. The water and sewer bill was $265.41 past due. (Defendant's Exhibit C.) The natural gas bill appeared to be at least $360.25 past due. (Defendant's Exhibit D.)
 {¶ 27} About a week after appellee left and after discovering the delinquencies related to the utilities, appellant contacted the company that held the mortgage on the marital residence and learned that it was in foreclosure because they had not received a mortgage payment in six or seven months. (Tr. 26-27.) Appellant also received a phone call from an employee at the clerk of courts informing him that there was paperwork for him to pick up related to the foreclosure. (Tr. 27.) The foreclosure action had been filed on October 14, 2003. (Defendant's Exhibit M.) Appellant testified that he never received notice that the mortgage payments were not being made or that foreclosure proceedings were going to be commenced. (Tr. 27-28.) Ultimately, appellant was able to keep the residence after he negotiated a work out agreement with the mortgage company resulting in $9,880.67, including interest, fees, and escrow, being added on to the end of the loan. (Tr. 29-30, Defendant's Exhibit G.) As a result, however, appellant was left with no equity in the home. (Tr. 30.)
 {¶ 28} Additionally, appellant was sued by two collection agencies after appellee left. (Tr. 30-32.) One was associated with hospital bills and the other with a credit card. (Tr. 31-32.) Appellant was able to reach agreements with those two creditors also. (Tr. 30-32.) Lastly, appellant discovered that between September 26, 2003, and October 4, 2003, appellee had written two checks to herself totaling $1700.00. (Tr. 33-34, Defendant's Exhibit A.)
 {¶ 29} As indicated earlier, and as repeatedly stressed by appellee, evidence of wrongdoing must exist to establish financial misconduct.Wideman, supra. The evidence presented at trial clearly established wrongdoing on the part of appellee. It was customary for appellant to give money to appellee and for appellee to pay the parties' bills with that money. Appellee indicated that the bills had been taken care of *Page 6 
when, in fact, they had not been paid. Therefore, it is apparent that appellee did not use the money appellant had given her entirely for its intended purpose. This implied wrongdoing on appellee's part.
 {¶ 30} Appellee cites cases for the proposition that the time frame of the alleged misconduct is important in considering wrongful scienter. Indeed, as this Court stated in Callender, supra at ¶ 20, "Often times, courts will look to the timeframe during which the alleged misconduct occurred because the use of marital funds or assets during the pendency of or immediately before filing for divorce may demonstrate wrongful scienter." In this case, the evidence was clear that appellee engaged in wrongdoing in the months leading up to their separation and ultimate divorce. Therefore, the time frame in this case serves only to enhance the wrongfulness of appellee's actions, not lessen it.
 {¶ 31} Appellee also cites Rinehart v. Rinehart (May 18, 1998), 4th Dist. No. 96 CA 10, where the court held that spending money alone, without evidence of wrongdoing, does not constitute financial misconduct. Rinehart is distinguishable from this case. InRinehart, the husband only spent money more freely than his wife. He did not spend money that was to be used for a specific purpose on something else. This was not financial misconduct. In this case, appellee was not only spending money; appellee was using money, meant to pay utilities and mortgage payments, for purposes other than its intended and customary use.
 {¶ 32} Citing this Court's decision in Callender, surpa, the trial court seemed to hinge its decision on its conclusion that appellant was unable to prove where the mssing money went. The trial court's reliance on Callender was misplaced for two reasons. First, nowhere inCallender did this Court state or infer that the person alleging financial misconduct must prove where the missing money went. Second, the underlying facts regarding the alleged financial misconduct inCallender are readily distinguishable from this case.
 {¶ 33} In Callender, the trial court found that for the first two years of the parties' marriage, the husband was unemployed and the wife was the primary *Page 7 
provider of financial support for the family. It noted that while the husband testified that he was the primary caregiver, at the time, the parties only had one daughter and she was already school age. The trial court further found that the husband gained employment in 1998. He then grossed approximately $26,500 per year while appellee grossed approximately $37,100 annually. The court noted that during the marriage, the wife handled all of the family's finances and paid the bills. The parties had one checking account from which the bills were paid and into which the wife's wages were directly deposited. The court found that the husband only contributed $5,400 in 1998, $4,900 in 1999, $2,400 in 2000, $3,500 in 2001, and $5,700 in 2002 to household expenses. The court noted that the husband's deposits/contributions were substantially less than half of his available income for those years.
 {¶ 34} The trial court found that while at some point, the husband made truck payments and had a Pennsylvania child support obligation to pay (in an unknown amount), his contributions of only $21,900 over five years was "certainly suspect if not pathetic." The court concluded that this "irresponsible behavior in not supporting one's spouse and two (2) minor children to the fullest extent possible should not be rewarded," and amounted to financial misconduct. Thus, the court determined that the wife was entitled to some compensation for appellant's mismanagement. In dividing the martial property, the court applied its finding of financial misconduct and awarded the wife her 403(B) retirement account of $6,141.87 in full.
 {¶ 35} This Court reversed the trial court's finding of financial misconduct noting that there were no allegations that the husband had personally profited from his actions or engaged in misconduct in order to defeat the wife's distribution of marital assets. This Court also noted that the husband's alleged misconduct occurred during the entire marriage, not simply the time prior to the divorce.
 {¶ 36} More particularly, this Court focused on the following facts when it concluded that the trial court acted unreasonably in finding that the husband engaged in financial misconduct. The husband testified that he did not know a lot about the family finances, but that the wife did. The wife testified that the husband *Page 8 
kept what he wanted from his paycheck and deposited the rest into the family checking account. She stated that she did not know where the money that the husband kept out of the checking account went. The court recognized that the husband paid a truck payment and a child support obligation. While it was not clear how much these payments were, there was some indication in the parties' bank records that the husband may have paid $111 for child support and $386 for his truck payment. It was also unclear whether the husband paid child support biweekly or monthly. This Court concluded that these two expenditures accounted for a sizeable portion of the husband's spending.
 {¶ 37} In contrast to Callender, in this case, it was the party accused of financial misconduct who largely controlled or took care of the parties' financial obligations. Here, appellee, unlike the husband in Callender, was in a better position to engage in financial misconduct. Also, since appellee did not appear and her counsel did not have anyone testify, there was no evidence to establish where she spent the money that had been given to her by appellant for the purpose of paying the parties' bills.
 {¶ 38} That is not to say that where the money went may not be part of a valid inquiry when considering whether there was wrongdoing. InCallender, we noted that when determining whether there was wrongdoing on the part of the accused spouse, the court could consider whether that spouse would profit from the misconduct. Callender, supra, at ¶ 20. Where the money went could certainly aid in that consideration. However, we noted wrongdoing could also be established by considering whether the accused spouse was intentionally trying to defeat the other spouse's distribution of assets. Id. For that consideration, where the money went seems less relevant.
 {¶ 39} Here, it was obvious that appellee was entrusted to take care of the parties' bills and, in the months leading up to their separation, directed the money in other ways that did not include contributing to the parties' marital assets and/or financial obligations. Therefore, it is apparent that she was intentionally trying to *Page 9 
defeat appellant's distribution of the marital assets.
 {¶ 40} In sum, the trial court's conclusion that appellee had not engaged in financial misconduct was unreasonable based on the totality of the evidence presented at trial and, therefore, constituted an abuse of discretion.
 {¶ 41} Accordingly, appellant's sole assignment of error has merit.
 {¶ 42} The judgment of the trial court is hereby reversed and vacated. This matter is remanded to the trial court for rehearing to determine an accurate amount representing appellee's financial misconduct and to enter a judgment distributing appellant's pension that takes into consideration and is reflective of that misconduct.
Vukovich, J., concurs.
 DeGenaro, P.J., concurs. *Page 1